**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INDERPAL SINGH, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>        v.<br><br>YUHE INTERNATIONAL, INC., GAO ZHENTAO, HU GANG, JIANG YINGJUN, PETER LI, LIU YAOJUN, GREG HUETT, HAN CHENGXIANG, CHILD VAN WAGONER & BRADSHAW, PLLC, ROTH CAPITAL PARTNERS, LLC, RODMAN & RENHAW, LLC and BREAN, MURRAY, CARRT & CO.,<br><br>                        Defendants. | No. 1:11-cv-04526-JGK |

**MEMORANDUM IN FURTHER SUPPORT OF MRMP-MANAGERS LLC FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL AND IN OPPOSITION TO COMPETING MOTIONS**

**TABLE OF CONTENTS**

I.    PREFATORY STATEMENT ................................................................................................ 1

II.   AADP DOES NOT MEET ALL OF THE LEAD PLAINTIFF
     QUALIFICATIONS SET FORTH IN THE PSLRA .......................................................... 2

     A.   AADP Cannot Withstand Even Minimal Scrutiny of Its Purported
          Typicality and/or Adequacy; Its Appointment As Lead Plaintiff Could
          Jeopardize the Class' Claims .................................................................................. 3

          1.   Hedge Funds Are Not Ideal Lead Plaintiffs................................................. 3

          2.   AADP's Face-To-Face Meetings with Yuhe's Top Executives and Its
               Exposure to Non-Public Information Renders AADP Vulnerable to
               Unique Defenses Not Applicable to the Class in General ........................... 5

          3.   AADP's Actions Are Part of the Case; Wimsatt's *SeekingAlpha* Post
               Assisted in Inflating Yuhe's Sagging Stock Price, Thereby Participating
               in Causing Injury to Class Members............................................................ 9

          4.   AADP's Business Relationship with A Yuhe Case Defendant
               Presents a Clear Conflict of Interest Resulting in Divergent Interests
               from Those of the Class ............................................................................. 10

     B.   At a Minimum the Court Should Allow MRMP to Take Discovery from
          AADP and Allow MRMP to Take Wimsatt's Deposition..................................... 11

III.  MRMP SHOULD BE APPOINTED LEAD PLAINTIFF BECAUSE IT IS THE
     MOVANT WITH THE LARGEST FINANCIAL INTEREST THAT ALSO
     SATISFIES THE REQUIREMENTS OF RULE 23 ......................................................... 12

# TABLE OF AUTHORITIES

**CASES**

*Applestein v. Medivation Inc.*,
  No. C 10-00998 MHP, 2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) .......................... 4, 11

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir.2000) ................................................................................................ 3

*Basic Inc. v. Levinson*,
  485 U.S. 224, 108 S.Ct. 978 (1988) ............................................................................. 6, 7

*Beck v. Status Game Corp.*,
  No. 89 Civ. 2923, 1995 WL 422067 (S.D.N.Y. July 14, 1995) ........................................ 8

*Grace v. Perception Tech. Corp.*,
  128 F.R.D. 165 (D. Mass. 1989) ..................................................................................... 7

*In re Bank One Shareholders Class Actions*,
  96 F. Supp. 2d 780 (N.D. Ill. 2000) ................................................................................ 4

*In re Cardinal Health, Inc. Sec. Litig.*,
  226 F.R.D. 298 (S.D. Ohio 2005) .................................................................................. 3

*In re Cavanaugh*,
  306 F.3d 726 (9th Cir. 2002) ........................................................................ 1, 2, 11, 12

*In re Cendant Corp. Litig*,
  264 F.3d 201 (3d Cir. 2001) ................................................................................. 1, 2, 11

*In re Herley Indus. Inc.*,
  CIV.A. 06-2596, 2010 WL 176869 (E.D. Pa. Jan. 15, 2010) ........................................... 4

*In re Independent Energy Holdings PLC Secs. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ................................................................................ 3, 8

*In re Microstrategy Sec. Litig.*,
  110 F. Supp. 2d 427 (E.D. Va. 2000) ............................................................................. 3

*Shiring v. Tier Technologies, Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007) ........................................................................... 3, 7, 10

# TABLE OF AUTHORITIES

*Swack v. Credit Suisse First Boston*,
    230 F.R.D. 250 (D. Mass. 2005) .................................................................................. 7, 8

*Takeda v. Turbodyne Techs., Inc.*,
    67 F. Supp. 2d. 1129 (C.D. Cal. 1999) ............................................................................ 12

*Yousefi v. Lockheed Martin Corp.*,
    70 F. Supp. 2d 1061 (C.D. Cal. 1999) ............................................................................. 12

**REGULATIONS**

15 U.S.C. § 78u-4(a)(3)(B)(i) ................................................................................................. 1

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ......................................................................................... 1, 2

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) ........................................................................................... 2

15 U.S.C. § 78u-4(a)(3)(B)(iv) ............................................................................................... 11

15 U.S.C.§ 78u-4(a)(3)(B)(iii)(II)(bb) ..................................................................................... 3

Fed. R. Civ. P. 23 ............................................................................................................ 1, 2, 12

Fed. R. Civ. P. 23(a) ........................................................................................................... 1, 12

**I.     PREFATORY STATEMENT**

Under the statutory scheme of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court must decide which of the two remaining movants[1] seeking appointment as Lead Plaintiff is "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i).[2]  Because the Lead Plaintiff will serve as a fiduciary to prosecute the action on behalf of the entire putative class, the movant selected must *both* have the greatest financial stake in the litigation *and* meet the individual requirements for a class representative under Fed. R. Civ. P. 23. *See In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002); *In re Cendant Corp. Litig,* 264 F.3d 201, 268-69 (3d Cir. 2001); 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Specifically, the movant's claims and the possible defenses thereto must be typical of those of class members, and the movant and its selected counsel must be able to adequately represent the class.

Here, the movant with the largest claimed losses is most clearly *not* a typical investor in the stock of defendant Yuhe International, Inc. ("Yuhe" or the "Company").  Rather, aAd Partners, L.P. ("AADP") is a hedge fund that proudly boasts both a "contrarian" investment strategy and a personal relationship with Yuhe's management that provided it access to non-public information during the Class Period.  AADP is also cozy with Yuhe underwriter Roth Capital Partners, a primary defendant in this action, and an anticipated primary defendant in related actions as they proceed, thus posing a serious potential conflict of interest.  Most damning of all, in April 2011, when its investment had lost $1.4 million in value, AADP's Daniel Wimsatt wrote an article touting Yuhe – describing meetings with defendant Gao in China while expressly refusing to share[3] what he gleaned from them – that helped boost Yuhe's share price two months before the share price collapsed due to the alleged fraud.  Having possibly contributed to class members' damages, AADP is wholly unfit to vindicate their rights.

Consequently, because AADP "does not satisfy the Rule 23(a) criteria," the Court must turn

---

[1] Movant Daiwu Chen subsequently withdrew his motion, and movant Kevin Carroll filed a response to the competing motions acknowledging that he does not have the largest financial interest in this litigation.  *See*, respectively, D.E. Nos. 25 and 26.
[2] *See* D.E. Nos. 11, 14, 17 and 20.
[3] On the investor website *Seeking Alpha.com*, Wimsatt wrote: "I am not going to share with you my estimates for what the company will earn in 2011 and 2012, nor what I believe they will do with all that cash they will generate; ***that work stays for the benefit of aAd Capital investors***." *See* Gonsiorowski Decl. at Exh. A (emphasis added).

1

to MRMP-Managers LLC, which lost more than $459,000 and is "the plaintiff with the next-largest financial stake." *Cavanaugh*, 306 F.3d at 730. With none of AADP's disabilities, MRMP "is both willing to serve [as lead plaintiff] *and* satisfies the requirements of Rule 23." *Id*. (emphasis added). Therefore, MRMP respectfully requests that the Court grant MRMP's motion for appointment as Lead Plaintiff, confirm MRMP's choice of counsel as Lead Counsel, and deny all competing motions.

## II.  AADP DOES NOT MEET ALL OF THE LEAD PLAINTIFF QUALIFICATIONS SET FORTH IN THE PSLRA

The PSLRA provides a systematic process for the Court to follow when determining who to appoint as a lead plaintiff. First, the Court must identify the "most adequate plaintiff," defined as the candidate with the "largest financial interest" in the litigation. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Here, movants claim the following losses from their purchases of Yuhe stock:

| MOVANT | LOSS ASSERTED |
|---|---|
| *aAd Partners, L.P. ("AADP")* | $4,558,080.75 |
| *MRMP-Managers LLC ("MRMP")* | $459,290.21 |

While AADP's claimed losses are unquestionably the greatest, the respective size of the movants' financial interests is merely the starting point of the analysis: A court may not simply "'presume' that the movant with 'the largest financial interest in the relief sought by the class' satisfies [Rule 23's] typicality and adequacy requirements." *Cendant,* 264 F.3d at 264. Rather, after identifying the movant with the largest financial interest, the Court must next determine whether that movant has also made a *prima facie* showing that it meets the typicality and adequacy requirements of Rule 23. *Cavanaugh*, 306 F.3d at 730. If the movant satisfies these requirements, it becomes the "presumptive lead plaintiff." *Id*.  Thereafter, the competing lead plaintiff applicants may submit "proof" that the presumptive lead plaintiff does not satisfy the requirements of Rule 23 or is subject to unique defenses. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (class members may provide evidence that movant "will not fairly and adequately protect the interests of the class"); *see also Cavanaugh*, 306 F.3d at 730.

### A. AADP Cannot Withstand Even Minimal Scrutiny of Its Purported Typicality and/or Adequacy; Its Appointment As Lead Plaintiff Could Jeopardize the Class' Claims

AADP's motion describes the "typicality" and "adequacy" requirements of the PSLRA, asserts AADP is the type of sophisticated institutional investor Congress hoped would serve as lead plaintiff, claims that AADP seeks identical relief to that sought by the class members (asserting the same legal theories), and assures the Court there are no facts suggesting a possible conflict of interest between AADP and the class. D.E. No. 12 at 8-10.[4]

Notably, AADP makes no mention of the one statutory requirement that dooms its application: A lead plaintiff cannot be "subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C.§ 78u-4(a)(3)(B)(iii)(II)(bb). "Regardless of whether the issue is framed in terms of the typicality of the representative's claims...or the adequacy of [their] representation ... there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [him]." *In re Independent Energy Holdings PLC Secs. Litig.*, 210 F.R.D. 476, 480 (S.D.N.Y. 2002) (citation omitted). Moreover, the mere fact that these defenses will be raised is sufficient to scuttle an application -- even if they are not meritorious -- because class certification can be denied if a proposed class representative "is subject to unique defenses which *threaten* to become the focus of the litigation.'" *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (emphasis added) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir.2000)). Here, AADP is materially hindered by a myriad of unique defenses, any of which threaten to become the focus of the litigation.

#### 1. Hedge Funds Are Not Ideal Lead Plaintiffs

AADP is a hedge fund. Courts have viewed these black-box investment vehicles -- which are known for their exclusive membership, complex structures, and mysterious operations -- with great skepticism, often finding them to be poor lead plaintiff candidates. *See, e.g.*, *In re Microstrategy Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000) (hedge fund is "an atypical investor that engages in transactions far beyond the scope of what a typical investor contemplates"); *see also In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 311 (S.D. Ohio 2005)(class "may

---

[4] AADP also contends that its counsel can ably serve the class. D.E. No. 12 at 10. This point is not challenged.

not be best served by the[] additional complications" afflicting any private investment firm with "complex corporate structure").[5]

By their nature, hedge funds such as AADP engage in unique trading and hedging strategies vastly different from those used by other class members. *See In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 784 (N.D. Ill. 2000) (rejecting hedge fund movant because of its unique "trading pattern"); *Applestein v. Medivation Inc.,* No. C 10-00998 MHP, 2010 WL 3749406, at *5 (N.D. Cal. Sept. 20, 2010) (noting "some, but not all, hedge funds are known for engaging in speculative, risky and atypical investments").

Here, a November 23, 2010, article that appeared in San Diego, California's *North County Times* titled *"Thinking ahead: Hedge Fund Contrarian Likes Stock Market Dogs,"* ("*Hedge Fund Contrarian*") provides insight into the investment strategy of Daniel Wimsatt, AADP's founder and Chief Investment Officer. Wimsatt honed his singular strategy over the course of many years, having started his first hedge fund in 1993, after a stint with Goldman Sachs. The article proudly publicized AADP's "contrarian" and atypical trading angle: "Wimsatt doesn't care if everyone is running into the big trading momentum plays that are Wall Street's darlings …. What Wimsatt … does care about is what everyone else throws on the scrap heap." The article also noted that of the 40 stocks in AADP's then-current portfolio, "the lion's share are shorted." *See Hedge Fund Contrarian* (Gonsiorowski Decl. at Exh. B).

Clearly, the typical individual investor or even a large institutional investor, such as a state pension fund or a widely-held mutual fund, does not look for "dogs" to invest in or take short positions in most of their portfolios. While Wimsatt may indeed be highly successful employing his unique method, AADP is hardly a typical shareholder of Yuhe common stock.

---

[5] The opacity of hedge funds and their well-documented access to non-public information, should rightfully give this Court pause. In a recent case, Galleon Management LP was appointed lead plaintiff and, subsequently, class representative. *In re Herley Indus. Inc*., CIV.A. 06-2596, 2010 WL 176869, at *1 (E.D. Pa. Jan. 15, 2010). Two weeks after the class was certified, "Galleon's managing partner, Raj Rajaratnam, was indicted on securities fraud charges." *Id*. "The indictment is part of the 'largest hedge fund insider trading case ever charged, criminally.'" *Id.* The withdrawal of the hedge fund left the case without its lead advocate, requiring the court to appoint another investor as class representative well into the litigation.

### 2. AADP's Face-To-Face Meetings with Yuhe's Top Executives and Its Exposure to Non-Public Information Renders AADP Vulnerable to Unique Defenses Not Applicable to the Class in General

According to the *North County Times* article, because AADP manages "roughly $40 million for 20 super-rich investors," Wimsatt is afforded the rare opportunity to "interact personally with senior management before he gives his point of view on a stock. He's chalked up thousands of visits to companies … spoken with executives in charge, and kicked the tires, so to speak." *See Hedge Fund Contrarian* (Gonsiorowski Decl. at Exh. B). Wimsatt himself boasts: "We get on an airplane and spend a day with the company." *Id.*[6]

This investment is no exception. Unlike the typical Yuhe investor, who was not in a position to fly to China to meet with management, AADP engaged in private discussions with Company executives during the class period, providing them with non-public information that informed AADP's investment decisions. Recounting his activities on the investor website *SeekingAlpha.com*, in an April 29, 2011, post entitled "Chicks Dig the Long Ball: Yuhe International Inc. (YUII)," Wimsatt indicated that these interactions were so intimate that he, "looked [CEO] Gao in the eye and shook his hand with the feeling that … we were communicating very directly." Gonsiorowski Decl. at Exh. A. Wimsatt, at great length, explained the nature of his fact-finding trip and what he uncovered:

> ***I met with several Chinese management teams and reached an early conclusion*** *that most do not have a fundamental understanding of how the US capital markets function or what a typical US institutional investor expects from a publically traded company management team.* ***I also learned through doing the work*** *that there are some US-listed small-cap Chinese companies with extremely favorable investment attributes which simply do not sync up with the sector throwaway valuations evident today.* ***One of those companies is Yuhe International Inc (YUII).***
>
> *I had the privilege of spending two weeks in China earlier this month as part of Roth's 6th Annual China Tour. In those two weeks and 5,000 miles of planes, trains and automobiles, I met with twelve companies – on their turf. Aside from the normal extensive due diligence one would expect with company visits, I came away having noticed some general traits consistent among the founders of these small-cap companies, which I think is important . . .*

\*   \*   \*

---

[6] *See also* Gonsiorowski Decl. at Exh. C at 7 (noting AADP "relies heavily on fundamental, primary research, including extensive due diligence and face-to-face meetings with company management").

> *I am not going to share with you my estimates for what the company will earn in 2011 and 2012, nor what I believe they will do with all that cash they will generate; that work stays for the benefit of aAd Capital investors.*
>
> \*   \*   \*
>
> If the macro story is sound, and the business economics are compelling, why in the world is YUII stock trading at $5.45, or just under 5x trailing earnings with significant growth still to come?  YUII is a reverse-merger company, and was not subject to as intense a due diligence process had they originated as an IPO.  The 10-K  (http://www.yuhepoultry.com/newEbiz1/EbizPortalFG/portal/html/sec.html) describes their offshore holding structure which, while commonly used by foreign investors with operations in China, introduces an additional degree of complexity. So yes, the business structure is complex but the business itself is simple.  Their business is predominantly a cash business which makes auditing more difficult than say for a hog producer selling to supermarkets.  ***Co-founder & CEO Zhentao Gao will at times act as the banker on weekends in order to facilitate business with the same farmers who have done business with him for nearly 20 years.  Local lenders to YUII, perhaps in the best position to understand how the business works, performed extensive due diligence and continue to lend money to the company; additionally, the last two sellers to YUII performed extensive due diligence and decided to take YUII stock at $10 a share, well above where the stock was trading at the time of the acquisition announcements.***
>
> \*   \*   \*
>
> ***I have done my work*** and I certainly have been wrong before.  ***But I have been there and seen for myself their business.  I have listened to farmers who buy their product and distributors who sell their product. I have looked Mr. Gao in the eye and shook hands with the feeling that although I do not speak the language we were communicating very directly***. I like companies with favorable revenue tailwinds, sustainable business models, glowing customer recommendations, and management teams who reach a point where they say "Enough.  We are better than you think we are.  Watch us."

*Id*.  (emphasis added).

This class period interaction with Yuhe and defendant Gao is problematic because plaintiffs in a securities class action rely on the fraud-on-the-market theory to establish a presumption of classwide reliance.[7]  This presumption, however, can be rebutted:

---

[7] The theory is premised on the assumption that the market price of a security traded in an efficient market will be based on the material information available and that the market will respond to that information with buyers and sellers relying indirectly on material omissions or misrepresentations concerning the security. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S. Ct. 978 (1988).  The fraud-on-the-market theory creates a rebuttable presumption of reliance.  *Id*. at 248.

6

>A problem can arise, however, when the putative class representative has relied upon "information that is not generally available to the public, and hence to the unnamed class representatives." *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 169 (D. Mass. 1989). In such an instance, "that purchaser cannot be said to have relied upon the integrity of the market," and therefore would be subject to a non-reliance defense should she attempt to invoke the fraud-on-the-market presumption of reliance.

*Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 262 (D. Mass. 2005). By meeting with Yuhe's top management, AADP cannot dispute that it is subject to unique defenses. *See Shiring*, 244 F.R.D. at 313-314 (plaintiff who had face-to-face meetings and conversations with company CFO was deemed atypical). As the *Shiring* court explained, AADP's mere exposure to non-public information alone constitutes a unique defense rendering AADP atypical:

>Whether the information to which these individuals had access would be relevant to a decision to purchase [the company's] securities, and whether plaintiffs actually relied on such information in their decision to purchase,…***whether these defenses will be successful is of no matter. The fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members.***

*Id.* at 314 (emphasis added). [8]

Indeed, the extent of AADP's familiarity with company insiders was confirmed by Yuhe during a conference call on May 16, 2011, a month after the Roth China tour discussed in Wimsatt's post, at which Yuhe announced its first quarter results to the investing public. In the following exchange Wimsatt indicated he was privy to Company information which, according to Wimsatt, was arguably unknown to U.S. investors:

>**Conference Call Operator:** Your next question comes from Dan Wismatt [sic] from AAD Capital.
>
>**Daniel P. Wimsatt:** Good evening.
>
>**Serena Wu [Yuhe Investors Relations Manager]:** Hello Dan.
>
>**Wimsatt:** Hi, how are you, Serena?
>
>**Wu:** I am doing good.

---

[8] Here, AADP made many purchases in March 2011, before Wimsatt's visit, but purchased no shares in April and May of 2011, next acquiring 150,000 shares of Yuhe stock in June, at lower prices. *See* D.E. No. 31 at 8 (transaction records). Defendants have fodder to argue that AADP's trading was influenced by the visit.

**Wimsatt:** Good, congratulations on the quarter and the results. I have three unrelated questions.

* * *

**Wimsatt:** Item number three, Serena, give us a sense for investor relation plans for the remainder of the year. How you are planning on coming back to the States, new coverage, et cetera. *And I think your story is still unknown by a lot of people in the States.*

**Wu:** [Non-English].

**Zhentao Gao [Yuhe Chief Executive Officer]:** [Non-English].

**Wu:** We do have further IR activity plans for the remainder of this year. And actually for the company we not only give the prior-year budget in terms of our operations, but also on our IR effect. We also budget the whole year's IR activities and its budgets. For next month in June, we will be attending the Jefferies Conference in Boston. And then in July we plan to attend the Global Hunters Securities Conference in San Francisco. And also in July, we also plan to attend the Asian-based industrial conferences organized by Macquarie Securities. And we will also be announcing our IR event participation through separate press releases. Thank you.

**Wimsatt:** Great. Congratulations again on the quarter, thanks.

**Zhentao Gao:** Thank you, Dan.

*See* Gonsiorowski Decl. Exh. D at 10-12 (emphasis added).

Quite simply, Wimsatt's apparent personal relationships with Yuhe management, clearly evident from both his *SeekingAlpha* post and his statements during the call, must disqualify AADP from serving as lead plaintiff in this case.[9]

---

[9] "Courts have routinely found a disqualifying unique defense where the potential named plaintiff has had a direct or personal relationship with a board member or officer of the issuing company." *Independent Energy*, 210 F.R.D. at 481. *See also Beck v. Status Game Corp.*, No. 89 Civ. 2923, 1995 WL 422067, at *4 (S.D.N.Y. July 14, 1995) (declining to appoint investor who met with company chief executive, indicated that the meeting influenced his decision to buy the stock, and also met the executive on other occasions; "[b]ased on these statements...Goldberg did not rely on public information in making his decision to purchase Status.").

3.     **AADP's Actions Are Part of the Case; Wimsatt's *SeekingAlpha* Post Assisted in Inflating Yuhe's Sagging Stock Price, Thereby Participating in Causing Injury to Class Members**

Due to numerous reports and allegations of fraud, by April 2011, the very existence of the reportedly strong business of many China-based companies traded in the United States was being called into question, raising concerns about the potential for massive fraud. One of the leading doubters, Carson Block, founder of the investigative website *Muddy Waters*, appeared on CNBC on April 12, 2011, and painted a very bleak picture of investment in China-based companies, such as Yuhe, that reached the U.S. markets through a reverse merger without much regulatory supervision.[10] Based upon his personal inspection of factories in China, Block suggested that some companies could be total shams.

Although not mentioned by name during the interview, Yuhe's credibility may have been called into question. On April 13, 2011, shares of Yuhe unexpectedly crashed $1.31 per share, or almost 20%. Following this decline in the stock, the Company issued a press release which indicated its belief that the decline was possibly the result of potential allegations of fraud at Yuhe. However, the Company sought to reassure investors that there were no such allegations, announcing:

> . . . [t]he Company's management is not aware of any negative allegations against the Company with respect to its operation that may result in the sudden price plunge of its stock. . . The Company has been and will continue to comply with the applicable U.S. securities regulation and to disclose any material information publicly in a timely fashion . . . .

*See* Gonsiorowski Decl. Exh. E at 1. However, these reassurances did little to encourage investor confidence in Yuhe's stock.

This turn of events was particularly bad for AADP. After its March 2011 purchases, AADP was holding 700,000 shares of Yuhe stock. *See* D.E. No. 31 at 8 (transactions). The April 13, 2011, dive cost AADP more than $915,000. Even after Yuhe denied there were any allegations against it, AADP was unable to recoup its significant losses. By April 28, 2011, AADP's investment had already lost $1.4 million of its value.

On April 29, 2011, AADP became proactive in its attempts to recoup its significant losses,

---

[10] *See* http://video.cnbc.com/gallery/?video=3000015842. At one point, Block stated that within deal circles these companies are commonly evaluated based upon how their representations to investors stack up against reality, *e.g.,* a Company might be described as "70% real."

by shamelessly attempting to boost the value of Yuhe's stock in Wimsatt's *SeekingAlpha* article, which touted the Company as a solid investment and tried to refute any potential concerns about the integrity of Yuhe, its operations, or its financial reporting.  In the article, he argued that Yuhe was undervalued.  Wimsatt claimed that he did the leg work necessary to evaluate the Company, stating he had "seen for myself their business. . . listened to farmers who buy their product and distributors who sell their product."  *Id*.  Additionally, to back up his position, Wimsatt claimed that he had "walked away impressed from my day at YUII impressed with the level of 'manufacturing' sophistication and quality control."   As for Yuhe's possible change of auditors, he chalked off accounting issues to the fact that Yuhe is a "cash business which makes auditing more difficult."  *See* Gonsiorowski Decl. at Exh. A.

Wimsatt was successful.  His personal experiences influenced the market, leading to an increase in the value of Yuhe's shares by $0.19 on May 2, 2011, and an additional $0.38 on May 3, 2011 (enough to lift the value of this 700,000 shares by approximately $400,000).

Wimsatt's questionable letter regarding Yuhe (re)inflated the stock price in a manner that injured purchasers following its publication.  AADP is thus not an adequate representative of the class because its interests were not – and now cannot be – aligned with those of the typical shareholder.  Not only has Wimsatt injected himself into the relevant facts of this case – raising, as issues, the extent to which the publication of his article artificially (re)inflated the price of Yuhe stock and directly contributed to the injury suffered by other members of the class – but both the article and Wimsatt's underlying interactions with the defendants make it possible that he will ultimately need to serve as a witness in this action.

### 4. AADP's Business Relationship with A Yuhe Case Defendant Presents a Clear Conflict of Interest Resulting in Divergent Interests from Those of the Class

Wimsatt and AADP appear to maintain a professional relationship with Roth Capital Partners, a Yuhe underwriter and sponsor of the China tour Wimsatt described in his April 29, 2011, article.  In particular, AADP participated in Roth's "2010 ROTH Hawaii Conference" held late-August to early-September 2010 at the Grand Wailea Resort, Maui, Hawaii.  In fact, AADP appears prominently in Roth's market materials for the program, which contain a flattering description and profile of AADP and Wimsatt.  *See* Gonsiorowski Decl. Exh. C at 7.

AADP's cozy relationship with Roth Capital Partners – an underwriter for Yuhe's $25

million share offering on October 25, 2010 – is a clear conflict of interest. As an underwriter for Yuhe's secondary offering, Roth Capital Partners is a primary defendant in this action, and it is anticipated that Roth will be a primary defendant in *Feyko v. Yuhe International Inc., et al.*, No. 11-cv-05511-DDP (PJWx) and *Wilson v. Yuhe International, Inc., et al.*, Case No. 1:11-cv-22305-PAS ("*Wilson*") – related actions currently pending, respectively, in the Central District of California and the Southern District Florida. Because of AADP's close relationship with Roth Capital Partners, AADP was provided with the potentially lucrative opportunity of purchasing 150,000 shares on the secondary offering. It is unclear whether AADP will be willing to aggressively pursue Roth Capital Partners in this litigation, as it could jeopardize its opportunity to gain access to potentially lucrative IPOs and other offerings. The class should not be subjected to this potentially serious conflict in the future.

Consequently, if AADP is appointed lead plaintiff its relationship with Roth and repeated participation in Roth's investor junkets and special meetings with company management will be problematic. Undoubtedly, AADP will not possess the same level of willingness and desire to zealously pursue claims against Roth than typical members of the putative class would possess. Because of this conflict, AADP's interests are not aligned with those of the class.

### B.     At a Minimum the Court Should Allow MRMP to Take Discovery from AADP and Allow MRMP to Take Wimsatt's Deposition

The PSLRA provides for limited discovery where there exists "a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iv); *see also Cavanaugh*, 306 F.3d at 730; *Cendant*, 264 F.3d at 270 n.48. As set forth above, MRMP has done far more than just establish a reasonable basis. In light of AADP's serious afflictions, the Court should, at a minimum, permit discovery concerning the issues raised above from AADP and Wimsatt.

Indeed, in instances where less specific concerns have been raised about a hedge fund, courts have deemed it necessary to at a minimum allow competing movants to conduct discovery. *See, e.g.*, *Applestein*, 2010 WL 3749406, at *5 (permitting discovery of hedge fund where movant's status as a hedge fund and "the lack of transparency and publically available information about [the hedge fund] ma[de] it impossible for the parties or the court to determine whether or not [the hedge fund] [wa]s a typical investor"); *Prissert v. Emcore Corp.*, No. 08-1190 MV/RLP, Memorandum

11

Opinion and Order at 7 (D.N.M. Sept. 25, 2009) ("allow[ing] limited discovery" because competing movants "have shown a reasonable basis for a finding that [a hedge fund's] standing, typicality adequacy or potentially unique defenses may render [the hedge fund] incapable of adequately representing the class") (attached to the Gonsiorowski Decl. at Exh. F).

### III.    MRMP SHOULD BE APPOINTED LEAD PLAINTIFF BECAUSE IT IS THE MOVANT WITH THE LARGEST FINANCIAL INTEREST THAT ALSO SATISFIES THE REQUIREMENTS OF RULE 23

"If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23." *Cavanaugh*, 306 F.3d at 730.  Because AADP is atypical and subject to unique defenses, and therefore, not the presumptive "most adequate plaintiff," the Court must turn its attention to the next-largest movant, MRMP.

MRMP suffered financial losses of more than $459,000 and readily satisfies the requirements of Rule 23.  In addition, MRMP's claims are typical of the claims asserted by Class.  As indicated in its initial motion, MRMP, like all members of the Class, alleges that defendants violated federal securities laws by publicly disseminating false and misleading statements concerning Yuhe's business, operations and financial performance and prospects. And, like all members of the Class, MRMP suffered its financial losses as a result of its purchases of Yuhe shares at prices artificially inflated by defendants' misrepresentations and omissions.  *See Takeda v. Turbodyne Techs., Inc.*, 67 F. Supp. 2d. 1129, 1137 (C.D. Cal. 1999).  Unlike AADP, MRMP does not have a relationship with Yuhe or its management that could give rise to unique defenses.

In addition, MRMP has retained experienced counsel and, as a result of its significant financial stake in this litigation, is ready, willing and able to provide vigorous prosecution of the claims in this action on behalf of absent Class members. *See Takeda,* 67 F. Supp. 2d. at 1137. Moreover, there is no indication that MRMP's claims are antagonistic to other Class members' claims.  *See Yousefi v. Lockheed Martin Corp.*, 70 F. Supp. 2d 1061, 1071 (C.D. Cal. 1999).  In sum, MRMP has amply demonstrated that it will "fairly and adequately protect the interests of the class." *See Takeda*, 67 F. Supp. 2d. at 1137.  Accordingly, MRMP should be appointed Lead Plaintiff and its selection of Glancy Binkow & Goldberg LLP as Lead Counsel should be approved.

DATED: September 9, 2011                    GLANCY BINKOW & GOLDBERG LLP

By:   *s/ Elizabeth M. Gonsiorowski*
Elizabeth M. Gonsiorowski (EG1212)
30 Broad Street, Suite 1401
New York, New York 10004
Telephone:   (212) 382-2221
Facsimile:   (212) 382-3944
Email:  egonsiorowski@glancylaw.com

-and-

GLANCY BINKOW & GOLDBERG LLP
Peter A. Binkow
Michael Goldberg
Robert V. Prongay
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160

*Proposed Lead Counsel*

13

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO SOUTHERN DISTRICT OF NEW YORK LOCAL AND ECF RULES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On September 9, 2011, I caused to be served the following documents:

**MEMORANDUM IN FURTHER SUPPORT OF MRMP-MANAGERS LLC FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL AND IN OPPOSITION TO COMPETING MOTIONS**

**DECLARATION OF ELIZABETH M. GONSIOROWSKI IN FURTHER SUPPORT OF MOTION OF MRMP-MANAGERS LLC FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL AND IN OPPOSITION TO COMPETING MOTIONS**

By posting the document to the ECF Website of the United States District Court for the Southern District of New York, for receipt electronically by the parties pursuant to the Court's ECF Mailing List. And on the following non-ECF registered party:

Sara Beth Brody
Sidley Austin LLP
555 California Street, Suite 2000
San Francisco, CA 94104
(415) 772-1200
Email: sbrody@sidley.com

**By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 9, 2011, at Los Angeles, California.

*S/ Elizabeth M. Gonsiorowski*
Elizabeth M. Gonsiorowski

# Mailing Information for a Case 1:11-cv-04526-JGK

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Craig Block**
  jblock@bermanesq.com,kdonovanmaher@bermanesq.com,ecf@bermandevalerio.com,bdentremont@bermanesq.com,norenstein@bermandevaleri

- **Anthony J. Costantini**
  ajcostantini@duanemorris.com

- **Elizabeth Mary Gonsiorowski**
  egonsiorowski@glancylaw.com,info@glancylaw.com

- **Roy Laurence Jacobs**
  rljacobs@pipeline.com

- **Suzan Jo**
  sjo@duanemorris.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Marvin Gerald Pickholz**
  mgpickholz@duanemorris.com

- **Kenneth Mark Rehns**
  krehns@cohenmilstein.com,efilings@cohenmilstein.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)